Judge Green
delivered the opinion of the Court.*
The act of February 28, 1816, enacted, “that the Executive be, and they are hereby authorised to contract with some person or persons, for regulating the surface of the public square, in the city of Richmond, and for enclosing, planting, and improving the same,” &c. - The second section, authorises the Executive to sell certain public property; and the third section, constituted the proceeds of *542 the sales, a fund for defraying the expenses authorised by ®rst sectaon °f the act, as far as the same may be necessary, and directed the disposition of the balance. The act did. not direct how these expenses should be liquidated ancj paj(3; leaving those matters to be disposed of according to the general laws.
At the instance of the Executive, a Mr. Godefroy prepared a plan, for regulating and improving the public square, and on the 13th day of September, 1816, a contract, between the then Governor and Thomas Strode, was entered into, which was afterwards approved and adopted by order of the Executive Council, by which Strode, for the consideration of $ 24,000, agreed to execute a specified portion of Godefroy’s plan. It seems that this plan, required a ravine between the Capitol and Go» vernor’s house, to be in part filled up; and that the'hands of the city of Richmond, and some at work on the Governor’s yard, were throwing dirt into that ravine.
The second article of the contract stipulated,££ that the parties agree, that if the corporation of the said city of Richmond, and the hands now at work on the Governor’s yard, fill more than half the bottom below the Capitol and the Governor’s house, according to the said design or plan of the said Godefroy, the said Strode is to be paid in proportion for the said deficiency.” It is difficult to understand the effect of this article. It seems, however, to have been understood, that there might be some deficiency in work, to be done by others; for doing which, Strode was to be compensated; and the work so to be done by others, seems to have been filling half the bottom.
The appellant in his petition alledges, that in 1817, he purchased from Strode a portion of his contract, with the assent of the Executive, and was formally substituted by Strode by a written agreement entered into between him and the then Governor of Virginia, which was lodged with the Executive; but which, as he is informed, cannot now be found. That there was some such supplemental eon- *543 tract, appears from two orders of Council; one of June 13, 1820, directing the Attorney General to sue both on Slrode’s and Shield’s contracts; and another of May 4, 1820, in which they state, that the contracts made with them by T. Strode and J. P. Shields, have not been complied with; and in that of June 13, 1820, they request the opinion of the Attorney General, whether the execution and acceptance of Shields’ contract, impairs or destroys the liability of T. Strode and his sureties. The purport of this contract, as stated by Shields in his petition, was, that he should complete the graduation of the ground: that he should turf certain parts of it; and plant certain trees, according to a plan specified; for which he was to receive $ 17,000 in instalments; payments to be made by order of the Executive, who were to superintend the work, and direct the payments. Shields proceeded to execute his contract, under the superintendence of Orris Payne, A. S. Brockenbrough, and Wilson Bryan, who were successively appointed by the Executive to superintend the execution of the improvements on the Capitol square. Shields alleges, that he has executed his contract, and that $400 of the $ 17,000 remain due to him; and that under the directions of the several superintendents, he did a great deal of extra work not in the contract; of which he exhibits an account, as to some of which there are proofs of particular prices agreed on, and as to other parts, there appears to have been no agreement as to price. He-particularly charges a very large sum for filling up the gully mentioned in the second article of Strode’s contract, estimating the work at 42,591 cubic yards; of which he states, that the corporation finished 13,666, leaving 29,225 cubic yards, for which he charges.
If the effect of the contract is such as I have supposed, and this were a true account of the quantity of the work, then he should have charged only the half of 42,591 yards less, 13,666, viz. 7,6294 yards. Of this and many other items, proofs were offered by Shields. No proof is offer *544 ed on the part of the Commonwealth, except the report of a comm{ttee of the Executive, who say that the work contracted for was not properly done. These details are not referred to, for the purpose of giving any opinion on the merits, but for the purpose of ascertaining the nature of the case; as the question of jurisdiction may be affected by them.
Shields, having applied to the Executive for an order to the Auditor to issue a warrant according to his account, which was refused, presented the account to the Auditor, who refused to issue a warrant; and Shields thereupon filed in the Chancery Court, his petition, which was both an original petition, and an appeal from the decision of the Auditor. The Attorney General, in his answer states, that a suit is brought against Shields, to recover damages for the nonperformance of his contract, which, in effect, puts in issue the matters slated in his petition, when they can be tried by a jury, the proper tribunal; and he objects to the jurisdiction of the Court.
The pendency of this suit at law against Shields, is no impediment to the remedy he is pursuing. No one matter which is the subject of his petition, can be decided in that suit, except the question whether he has completely performed his contract, or not; and whether he has, or not, he can neither recover nor discount in that suit, the $ 400 which he alleges to be unpaid, of the contract price of $ 17,000; nor can his claim under the second article of Strode’s contract, or for the work not embraced in the, original contract, be discussed or settled in that suit.
The only questions are, whether this is such a case as entitles the petitioner to prosecute his claim, either in the Court of Chancery, or the Superior Court of Law held at Richmond; and if it is, in which of those Courts he ought to have proceeded ?
, In the case of the Commonwealth v. Pierce’s adm’r. ante 432, it was held that the petitioner was entitled to no relief, because he had no claim upon the Commonwealth, *545 but for what the Executive should allow; the law, under which he claimed, giving him a right only to what the Executive, in their discretion, should deem just and necessary; and, if he claimed independent of that act, that there was no law, or resolution of the Assembly, which authorised such a.claim against the Commonwealth.
This case is not like that. The act of 1816, authorised the Executive to contract for all the work which was done; made an appropriation for the payment of the expense, and prescribed no mode of adjustment and payment, but that prescribed by the general laws for liquidating and recovering all other legal claims against the State. The contract, as it is said, provided that the warrants for the payments, should issue upon the orders of the Executive. The Auditor could not, therefore, lawfully issue a warrant without such order. But upon the refusal of such order, if, injustice, it ought to have been given, the party might resort to the Courts by original petition, under that clause of the general law, prescribing the duties of the Auditor, which allows such a petition, in case where thé party has a claim, in law or equity, against the public, which is not proper to be presented to the Auditor. The refusal of the Executive to give orders for payment, did not destroy Shields’s legal right, if he was entitled to claim under his contract or contracts, since they had no discretion to determine, finally, the extent of his rights, as they had in the ease before mentioned.
Although the statute is in general terms, and seems to give an election to the party in all cases, to petition either the Chancery or Superior Court, (and I believe it has been the practice to exercise that discretion without objection,) I should incline to think, that the effect of the statute was, to refer cases, which, if they concerned individuals, would be most proper for a Court of Law or of Equity, according to their circumstances, either to the one or the other, as might be most proper upon that principle. It is, however, unnecessary in this case, to decide that ques *546 tion; since, if this case were, from its general character, most proper for a Court of Law, there are circumstances in it, which make it proper for a Court of Equity.
The contract upon which Shields must have proceeded a Qourj; 0f Law, for a part, of his demand, was either lost, or not in his power; and, although a party may now proceed on a lost deed, at law, that does not impair the original Chancery jurisdiction in such cases. The Court of Chancery, therefore, had jurisdiction, and the facts of the case might have been ascertained by reference to a commissioner, or by issues to be tried by a jury, according to the common course of the Court. The Attorney General, in his answer, suggests a doubt, whether the extra work ordered and contracted for by the superintendents, was duly authorised. Whether these superintendents were, or were not, authorised by the Executive to contract for this part of the work, was a fit enquiry to be made in the Court of Chancery. The Court does not appear to have decided upon the merits, but to have dismissed the bill for the want of jurisdiction.
The decree should be reversed, and the cause remanded, to be proceed in upon the merits. ^ ■

 The President and Judge Coadteb, absent.